## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZACH STACHON, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br>           v.<br><br>BANK OF AMERICA, N.A., BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LIMITED, MERRILL LYNCH INTERNATIONAL, MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BARCLAYS SERVCES LIMITED, BARCLAYS CAPITAL SECURITES LIMITED; BNP PARIBAS S.A., BNP PARIBAS SECURITIES CORP.; CITIGROUP INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED; CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE SECURITES (EUROPE) LTD., CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC.; HSBC SECURITIES (USA) INC., HSBC BANK PLC,  J.P. MORGAN CHASE & CO.; JPMORGAN CHASE BANK N.A.; J.P. MORGAN SECURITIES INC.; J.P. MORGAN CLEARING; NOMURA SECURITIES INTERNATIONAL, INC., NOMURA INTERNATIONAL PLC; ROYAL BANK OF CANADA, RBC CAPITAL MARKETS, LLC, RBC EUROPE LIMITED; THE TORONTO-DOMINION BANK, TD SECURITIES LIMITED, TD SECURITIES (USA) LLC; UBS AG; UBS SECURITIES LLC; HIREN GUDKA, BHARDEEP SINGH HEER, AMANDEEP SINGH MANKU, GARY MCDONALD, | Case No.<br><br>**CLASS ACTION COMPLAINT** |

SHAILEN PAU, and BHARDEEP SINGH
HEER,

      *Defendants.*

Plaintiff Zach Stachon, on behalf of himself and all others similarly situated, brings this class action for violations of the Donnelly Act against Defendants, which are among the largest dealers, or who are among the most prominent traders, of supranational, sub-sovereign, and agency bonds denominated in various currencies ("SSA bonds"). Plaintiff's allegations are made on personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.    This case concerns a conspiracy by Defendants to fix prices and restrain competition in the market for U.S. dollar-denominated ("USD") supranational, sovereign, and agency bonds ("SSA bonds"). Plaintiff and members of the proposed Class own and are indirect purchasers of USD SSA bonds from Defendants and/or Defendants' co-conspirators.  Simply put, Plaintiff and members of the Proposed Class purchased USD SSA bonds from third parties such as re-sellers or brokers of such bonds, and those third parties purchased the USD SSA bonds directly from Defendants and/or Defendants' co-conspirators.

2.    SSA bonds are debt securities issued by governmental and quasi-governmental entities, such as the World Bank and the European Investment Bank, for the purpose of funding a range of economic and public-policy initiatives. SSA bonds are generally regarded as secure investments by investors around the world because they often enjoy special legal status and their credit-worthiness is often pegged to sovereign, regional, or international entities.   Unlike corporate bonds issued by a company whose financial well-being is obviously critical to the

repayment obligations tied to those corporate bonds, SSA bonds are backed by the creditworthiness of the governmental or quasi-governmental entities. In the case of some issuers of SSA bonds, like the United States, creditworthiness is substantial and practically unquestioned. USD SSA bonds, which are the focus of this case, are principally directed at the U.S. financial markets.

3.    Defendants in this case are (i) several banks that operated as primary dealers in the USD SSA bond market ("Dealer Defendants"), and (ii) individuals with responsibility for the USD SSA trading business at each of their respective banks ("Individual Defendants").

4.    As competitors in the market for USD SSA bonds, Defendants (and their employees acting on their behalf) were expected to compete vigorously for the business of investor clients. Free-market competition is, of course, the fundamental economic policy of the United States. This policy is enshrined in the Donnelly Act, which makes it *per se* illegal for competitors (like Defendants here, who competed in the market for customers desiring to engage in USD SSA bond-related transactions) to conspire and coordinate with each other to limit competition regarding price and terms of sale, thereby harming the market in which those customers, including Plaintiff, participated. In financial markets, competition among dealers drives better terms and prices for investors, just as competition among suppliers drives better product quality and prices. The Supreme Court has described collusion among competitors of the type that occurred in this case as "the supreme evil of antitrust."[1]

5.    In the consolidated direct purchaser litigation concerning price-fixing in the market for SSA bonds,[2] a sizable volume of evidence from the Defendant banks has already been

---

[1] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).
[2] *See* 1:16-cv-03711-ER, *In re: SSA Bonds Antitrust Litigation* (S.D.N.Y.).

discovered. Documents produced by Defendants Bank of America, HSBC[3] and Deutsche Bank, who have settled with the direct purchaser plaintiffs, further substantiate Plaintiff's claims. Those documents are referenced in the operative direct purchaser complaint, the redacted version of which is attached hereto and incorporated by reference. *See* 1:16-cv-03711-ER, *In re: SSA Bonds Antitrust Litigatio*n (S.D.N.Y.) (attached hereto as **Exhibit A**).

6.     This case differs from the direct purchaser MDL in several important ways.

7.     First, Plaintiff in this matter bought his SSA bonds indirectly via retirement investment funds from UBS, one of the conspirators here. Plaintiff is therefore an indirect purchaser of SSA bonds. As a result, this case concerns antitrust claims arising under New York state law (the Donnelly Act) and ***not*** antitrust claims arising under federal law (the Sherman Act) like those at issue in the direct purchaser MDL.

8.     Plaintiff's Complaint also takes into account the Court's ruling on the motion to dismiss filed in the direct purchaser MDL. (*See In re SSA Bonds Antitrust Litig*., 2018 U.S. Dist. LEXIS 147022, at *23 (S.D.N.Y. Aug. 24, 2018) (dismissing claim "because Plaintiffs have not plausibly alleged that they . . . were injured by the alleged conspiracy," but noting that actual damages could have been sufficiently pled "by means of statistical analysis of market prices . . . alleg[ing] the expected impact of a manipulative tactic on a given market"). Plaintiff has engaged Dr. Stephen E. Christophe, Professor of Finance at the George Mason University School of Business, as an expert to evaluate the nature of the harm suffered by Plaintiff. Plaintiff respectfully submits a declaration from Dr. Christophe along with this Complaint, which is attached hereto as **Exhibit B**.

---

[3] *See* https://www.reuters.com/article/us-hsbc-settlement-bonds/hsbc-to-pay-30-million-to-settle-bond-rigging-lawsuit-in-us-idUSKCN1P41W3 (last viewed February 1, 2019).

9.     Lastly, and as described above, Plaintiff advances claims on behalf of *indirect* purchasers of USD SSA bonds who suffered damages as a result of Defendants' misconduct. This group purchased the product at issue (USD SSA bonds) in a different way than those who purchased directly from the Defendants and were not previously represented in the direct purchaser MDL.

10.     For these reasons, Plaintiff's Complaint is related, but nonetheless distinct, from the direct purchaser MDL.

11.     As the MDL direct purchaser plaintiffs note, there are *thousands* of incriminating Internet chat room transcripts and audio recordings concerning Defendants' manipulation of the SSA bond market, including many that have been collected and produced by Defendants to government authorities as part of ongoing investigations into Defendants' SSA bond market collusion being conducted by regulators in the United States and Europe. Those documents will reveal even more about the operational specifics of Defendants' cartel.

12.     Defendants did little or nothing to monitor the "chats" their traders were having with their supposed competitors in these electronic chatrooms.

13.     Defendants' overarching objective was to ensure that cartel members could transact with investors at prices that were more favorable for the conspiring dealers (and therefore worse for their customers) than could have been achieved in the absence of collusion. In addition to refraining from competing with each other, Defendants actively helped each other to subvert competition so they could execute USD SSA bond trades on financial terms that were more favorable for the conspirators than they would have been in a competitive market.

14.     Defendants used a variety of techniques, which they honed over time, to accomplish their shared objective of manipulating the SSA bond market for their benefit.

15.    By knowing information about certain market participants' inventory (*e.g.*, what bonds they currently hold) and order flow (*e.g.*, what trades are going to be placed in the future), conspiring Defendants armed with that information can and have positioned themselves in the market to take advantage of the knowledge of how those orders and the inventory behind them would affect the market price in general.  As the conspiring Defendants positioned themselves in the market based on this inside information, those in the market without the information were harmed.

16.    In 2015, the United States Department of Justice ("DOJ") launched its investigation of certain Defendants after Defendants' anticompetitive activity was discovered. Many individual traders, who were then employees of Defendants, have lost their jobs as a result of their wrongdoing in furtherance of the conspiracy. While the DOJ investigation is still ongoing, there is a real potential for significant fines and other penalties given the wide-ranging nature and effects of Defendants' manipulation of the USD SSA market.

17.    The DOJ investigation will not, however, compensate the individual victims of Defendants' scheme for the financial harm they suffered as a result of Defendants' anticompetitive activity.  These victims include the many individual investors who comprise the proposed class of plaintiffs in this case (the "Class").

18.    This class action now seeks to recover the monetary damages suffered by those U.S. investors who indirectly traded USD SSA bonds with Defendants during the Class Period, as further defined below.

## II.    <u>JURISDICTION AND VENUE</u>

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a). Jurisdiction is also had under 28 U.S.C. § 1332, because the amount in

controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than Defendants.

20.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

21.    This Court has personal jurisdiction over various corporate Defendants pursuant to the nationwide contacts test provided for in 15 U.S.C. § 22 because numerous corporate Defendants, as set forth below, were formed in or have their principal places of business in the United States.

22.    In addition, as detailed below, this Court has personal jurisdiction over Defendants because each Defendant transacted business in and throughout the United States, including in this District; each Defendant had substantial contacts with the United States, including in this District; each Defendant committed overt acts in furtherance of Defendants' conspiracy in the United States; each Defendant is an agent of the other Defendants; each Defendant continuously and deliberately exploited the U.S. market for USD SSA bonds and U.S. investors; and Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

23.    Defendants' conspiracy was directed at and repeatedly targeted U.S. investors throughout the Class Period, including in this District. USD SSA bonds, some categories of which are referred to colloquially as "Yankee" bonds, are primarily marketed to U.S. investors,

including pension funds, asset managers, insurance companies, university endowments, and hedge funds. Furthermore, essential steps in the conspiracy occurred in the United States and involved transactions with U.S. investors. Thus, the scheme inherently involved trade or commerce taking place in the United States, with U.S. investors. Defendants knew that the brunt of the harm caused by their scheme would be felt by investors in the United States. To the extent that the conspiracy may also involve commerce with foreign entities, it remains the case that this scheme had a direct, substantial, and reasonably foreseeable effect on commerce in the United States.

24.    Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and did have a substantial effect on interstate commerce.

25.    The Court also has jurisdiction over Defendants pursuant to New York's C.P.L.R. § 302, because Defendants are present and/or transact business in New York State; each Defendant had substantial contacts with New York State; each Defendant committed overt acts in furtherance of Defendants' conspiracy in New York State; each Defendant is an agent of the other Defendants; and Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York State.

### III.    THE PARTIES

#### A.    Plaintiff

26.    Plaintiff Zach Stachon ("Stachon") is a resident of Des Moines, Iowa.  He has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the UBS 401(k) Plan ("the UBS Plan").  Through the UBS Plan, he owns and is invested in the Vanguard Target Retirement 2030 Fund, which was itself invested in the Vanguard Total Bond Market II Fund. The Vanguard Total Bond Market II Fund purchased shares of bond issuances on September 5, 2014 and April 28, 2015 that were each underwritten by Defendants.  The September 2014

issuance was underwritten by Defendants J.P. Morgan Securities, Merrill Lynch, Pierce, Fenner & Smith Inc., and The Toronto-Dominion Bank, and the April 2015 issuance was underwritten by Defendants Deutsche Bank, Nomura, and RBC Capital Markets.  The Vanguard Total Bond Market II Fund, and indirectly the investors therein including Plaintiff, purchased these bonds at or near the date they were issued at supra-competitive prices as a result of Defendants' price-fixing behavior.  Accordingly, and as a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff Stachon was injured in his business or property.

## B.    **Defendants**

27.    Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

28.    Various other entities, persons, firms, and corporations, which are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

### 1.    *Dealer Defendants*

29.    **Bank of America**. Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is an indirect, wholly owned subsidiary of Bank of America Corporation.

According to U.K. Financial Conduct Authority ("FCA") records,[4] colluding SSA bond traders Gary McDonald, Amandeep Singh Manku, and Hiren Gudka were registered as advisers to perform controlled functions or otherwise act on BANA's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, BANA (acting at least through McDonald, Manku, and Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. Manku and Gudka are under investigation by the DOJ.

30.    Defendant Bank of America Merrill Lynch International Limited ("BAMLIL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation. According to FCA records, colluding SSA bond traders Gary McDonald, Amandeep Singh Manku, and Hiren Gudka were registered as advisers to perform controlled functions or otherwise act on BAMLIL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, BAMLIL (acting at least through McDonald, Manku, and Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. BAMLIL often directed and controlled

---

[4] The FCA uses codes to designate various functions that individuals may perform in the financial industry, most of which relate to the carrying on of regulated activities by a firm. For instance, CF 30 ("Customer Function") means that the registered individual may, among other things, advise customers on various investments. The codes and their respective meanings can be found on the FCA's website, https://www.fca.org.uk/.

the trading of USD SSA bonds by Merrill Lynch, Pierce, Fenner & Smith Inc. and booked the profit from such trades.

31.    Defendant Merrill Lynch International ("MLI") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation. According to FCA records, colluding SSA bond traders Amandeep Singh Manku, Hiren Gudka, were registered as advisers to perform controlled functions or otherwise act on MLI's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, MLI (acting at least through Manku, Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. MLI often directed and controlled the trading of USD SSA bonds by Merrill Lynch, Pierce, Fenner & Smith Inc. and booked the profit from such trades.

32.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Bank of America Corporation. MLPF&S indirectly executed USD SSA bond trades with members of the Class during the Class Period. As detailed more fully below, during the Class Period, MLPF&S directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. MLPF&S often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of BAMLIL and/or MLI.

33.    Defendants BANA, BAMLIL, MLI, and MLPF&S are referenced collectively in this Complaint as "Bank of America."

34.    Bank of America regularly transacts business in and has substantial contacts with New York, New York. For instance, BANA maintains one of its largest branches, with at least hundreds of employees, located at the "Bank of America Tower," in New York, New York.[5] Likewise, MLI has at least two "Global Wealth Management" offices, with many employees, located in New York, New York.[6] As discussed above, MLPF&S has its principal place of business in New York, New York. In addition, BANA, BAMLIL, MLI, and MLPF&S each indirectly participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

35.    **Barclays.** Defendant Barclays Bank plc ("BBPLC") is a corporation organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom. On information and belief, BBPLC priced, promoted, and/or executed USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, BBPLC (acting at least through one, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. BBPLC often directed and controlled the trading of USD SSA bonds by Barclays Capital Inc. and booked the profit from such trades.

36.    Defendant Barclays Capital Inc. ("BCI") is a corporation organized under the laws of Connecticut with its principal place of business in New York, New York. BCI is the

---

[5] *See* Bank of America Locations, available at:
https://locators.bankofamerica.com/ny/newyork/financialcenters-new-york-16579.html.
[6] *See* Merrill Lynch Global Offices, available at https://www.ml.com/global-offices html.

main U.S. broker-dealer entity for the Barclays group. BCI had brokers based in the United States and New York who facilitated and executed USD SSA bond indirectly with members of the Class. As detailed more fully below, during the Class Period, BCI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. BCI executed USD SSA bond trades indirectly with members of the Class during the Class Period. BCI often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of BBPLC, Barclays Services Limited, and/or Barclays Capital Securities Limited.

37.    Defendant Barclays Services Limited ("BSL"), formerly known as Barclays Capital Services Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom. According to chat transcripts, at least one colluding bond trader acted on BSL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond indirectly with members of the Class. As detailed more fully below, during the Class Period, BSL (acting at least through one, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. BSL often directed and controlled the trading of USD SSA bonds by Barclays Capital Inc. and booked the profit from such trades.

38.    Defendant Barclays Capital Securities Limited ("BCSL") is a corporation organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom. BCSL has at least one employee based in New York and doing business on its behalf. According to FCA records, a colluding SSA bond trader was registered as an adviser to

perform controlled functions or otherwise act on BCSL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, BCSL (acting at least through one, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. BCSL often directed and controlled the trading of USD SSA bonds by Barclays Capital Inc. and booked the profit from such trades.

39.    Defendants BBPLC, BCI, BSL, and BCSL are referenced collectively in this Complaint as "Barclays."

40.    Barclays regularly transacts business in and has substantial contacts with New York, New York. BBPLC has two branches located in New York, New York, which are licensed by the New York Department of Financial Services ("NYDFS"), and which employ at least hundreds of employees located in New York, New York."[7] As discussed above, BCI has its principal place of business in New York, New York. Barclays also has other interests in the state. For example, the Barclays Center—a sports arena for which Barclays paid $400 million for the naming rights—is located in Brooklyn, New York.[8] In addition, BBPLC, BCI, BSL, and BCSL participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

41.    ***BNP Paribas.*** Defendant BNP Paribas S.A. is a French corporation with its principal place of business in Paris, France. As of 2016, BNP Paribas S.A. maintained three

---

[7] *See* NYDFS, New York Banking Department approves License for Barclays Bank PLC to Open Representative Office in Long Island City, November 25, 2008 (available at http://www.dfs.ny.gov/about/press/pr081125 htm).

[8] R. Sandomir, What is in a Name? $400 Million, N.Y. TIMES (Jan. 19, 2007) (available at http://www.nvtimes.com/2007/01/19/sports/basketball1/19sandomir.html).

branches in the United States, including one in New York. BNP Paribas S.A. also had one agency office and two representative offices in the United States at that time. BNP Paribas S.A. is registered with the NYDFS to do business in New York. As of the end of 2015, BNP Paribas S.A. had at least 780 full-time employees in the United States, of which 78% were employed in New York. BNP Paribas S.A. operates a "Corporate Coverage team" in New York, which offers all of BNP Paribas' products.[9] For the year ending December 31, 2016, BNP Paribas S.A. reported revenues from its operations in the United States of €4.456 billion ($4.689 billion).[10]

42.    According to FCA records, colluding SSA bond traders were registered as advisers to perform controlled functions or otherwise act on BNP Paribas S.A.'s behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, BNP Paribas S.A. (acting at least through one, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. BNP Paribas S.A. often directed and controlled the trading of USD SSA bonds by BNP Paribas Securities Corp. and booked the profit from such trades.

43.    Defendant BNP Paribas Securities Corp. ("BNP Securities") is a Delaware Corporation with its principal place of business in New York, New York. BNP Securities executed USD SSA bond trades indirectly with members of the Class during the Class Period. As detailed more fully below, during the Class Period, BNP Securities directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in

---

[9] *See* BNP Paribas, *Registration Document and Annual Financial Report 2016*, at 13 (2017).
[10] *Id*. at 538.

these activities in the United States, including in New York, including by serving as a trading broker. BNP Securities often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of BNP Paribas S.A.

44.    Defendants BNP Paribas S.A. and BNP Securities are collectively referred to as "BNP Paribas" in this Complaint.

45.    BNP Paribas regularly transacts business in and has substantial contacts with New York, New York. As discussed above, BNP Paribas S.A. has a branch office, hundreds of employees, and substantial financial operations in New York, New York. As also discussed above, BNP Securities has its principal place of business in New York, New York. In addition, BNP Paribas S.A. and BNP Securities both participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

46.    **Citi.** Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York, New York. Colluding SSA bond trader Defendant Gary McDonald has been employed by Citigroup since September 2010. McDonald had a close relationship with several SSA bond traders under investigation by U.S. and European authorities. Acting through at least McDonald, and likely many other employees, Citigroup priced, promoted, and/or executed USD SSA bond trades indirectly with members of the Class during the Class Period.

47.    Defendant Citibank N.A. ("Citibank") is a federally-chartered national banking association with its principal place of business in Sioux Falls, South Dakota, and is a subsidiary of Citigroup. According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on Citibank's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond

trades indirectly with members of the Class. As detailed more fully below, during the Class Period, Citibank (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.

48.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its principal place of business in New York, New York. CGMI is an indirect, wholly owned subsidiary of Citigroup. As detailed more fully below, during the Class Period, CGMI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. CGMI often purposely executed USD SSA bond trades at the direction and with the knowledge and consent of Citigroup Global Markets Limited.

49.     Defendant Citigroup Global Markets Limited ("CGML") is a U.K.-registered private limited company with its principal place of business in London, United Kingdom. CGML is an indirect, wholly owned subsidiary of Defendant Citigroup. CGML has at least one employee based in New York and doing business on its behalf. According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on CGML's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, CGML (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. CGML often directed and controlled the trading of USD SSA bonds by CGMI and booked the profit from such trades.

50.    Defendants Citigroup, Citibank, CGMI, and CGML are collectively referred to as "Citi" in this Complaint.

51.    Citi regularly transacts business in and has substantial contacts with New York, New York. As discussed above, Citigroup, Citibank, and CGMI each have their principal place of business in New York, New York. In addition, Citigroup, Citibank, CGMI, and CGML each participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

52.    **Crédit Agricole**. Defendant Crédit Agricole Corporate and Investment Bank ("Crédit Agricole") is a bank organized and existing under the laws of France with its principal place of business in Paris, France. Crédit Agricole has two branch locations in the United States, including one branch located in New York. Crédit Agricole is registered with the NYDFS to do business in New York, which accounts for the largest share of its U.S.-based employees. In 2016, Crédit Agricole recognized €939 million ($988 million) in revenue from its operations in the United States. Crédit Agricole operates its parent's corporate and investment banking business line, which Crédit Agricole S.A. has touted as "the strategic partner of its customers, corporates, and financial institutions, in France and internationally, thanks to its network in the main countries in Europe, Americas, Asia-Pacific and Middle East."[11]

53.    According to FCA records, colluding SSA bond traders Amandeep Singh Manku, was registered as an adviser to perform controlled functions or otherwise act on Crédit Agricole's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, Crédit Agricole (acting at least through Manku, but likely many

---

[11] *See* Crédit Agricole S.A., *Annual Financial Report Registration Document 2015*, at 23 (2016).

additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.

54.     Crédit Agricole regularly transacts business in and has substantial contacts with New York, New York. As discussed above, Crédit Agricole has a branch located in New York, New York, is registered with the NYDFS to do business in New York, and has the majority of its U.S. employees located in New York, New York. In addition, Crédit Agricole participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

55.     ***Credit Suisse.*** Defendant Credit Suisse AG ("CSAG") is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. CSAG is the principal operating subsidiary of Credit Suisse Group AG. In their 2016 Annual Report, Credit Suisse Group AG and CSAG listed their main office in the Americas as being in New York City.[12] CSAG has direct and indirect subsidiaries in the United States, including Credit Suisse Holdings (USA), its U.S. holding company. In 2016, all 105 of CSAG's U.S.-based employees were located in New York.

56.     According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSAG's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. CSAG is registered with the NYDFS to do business in New York. As detailed more fully below, during the Class Period, CSAG (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities

---

[12] *See* Credit Suisse Group AG & Credit Suisse AG, *Annual Report 2016*, at A-12 (2017).

to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. CSAG often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

57.    Defendant Credit Suisse Securities (USA) LLC ("CSSUSA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse Group AG. According to FCA and FINRA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSSUSA's behalf during the Class Period, which included pricing, promoting, and executing USD SSA bond trades with indirectly members of the Class. As detailed more fully below, during the Class Period, CSSUSA directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. CSSUSA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of CSAG, Credit Suisse Securities (Europe) Ltd., and/or Credit Suisse International.

58.    Defendant Credit Suisse Securities (Europe) Ltd. ("CSSEL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG. Credit Suisse Securities (Europe) Ltd. has 16 subsidiaries in the United States, and approximately 31% of its credit risk exposures were attributable to the United States in 2016.[13] Colluding SSA bond trader Defendant Shailen Pau was an employee of CSSEL and acted on its behalf to price, promote, and/or executed USD SSA bond trades indirectly with members of the Class during the Class Period.

---

[13] *See* Credit Suisse Securities (Europe) Limited, *Annual Report 2016*, at 12 (2017).

As detailed more fully below, during the Class Period, CSSEL (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. CSSEL often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

59.    Defendant Credit Suisse International ("CSI") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG. Approximately 32% of its credit risk exposures were attributable to the United States in 2016.[14] According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSI's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, CSI (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. CSI often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

60.    Defendants CSAG, CSSUSA, CSSEL, and CSI are referenced collectively in this Complaint as "Credit Suisse."

61.    Credit Suisse regularly transacts business in and has substantial contacts with New York, New York. As discussed above, CSAG maintains its main branch office for the Americas in New York, New York, is licensed by the NYDFS to do business in New York, and

---

[14] *See* Credit Suisse International, *Annual Report 2016*, at 13 (2017).

has over 100 employees located in New York, New York. CSSUSA has its principal place of business in New York, New York. In addition, CSAG, CSUSA, CSSEL, and CSI each participated in USD SSA bond trading with members of the Class located in New York, New York, during the Class Period.

62.    **Deutsche Bank.** Defendant Deutsche Bank AG ("DBAG") is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. DBAG is licensed by the NYDFS, with a registered address in New York, New York. According to FCA records, colluding SSA bond trader Hiren Gudka was registered as an adviser to perform controlled functions or otherwise act on DBAG's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, DBAG (acting at least through Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. DBAG often directed and controlled the trading of USD SSA bonds by DBSI and booked the profit from such trades.

63.    Defendant Deutsche Bank Securities Inc. ("DBSI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of DBAG. DBSI executed USD SSA bond trades indirectly with members of the Class during the Class Period. As detailed more fully below, during the Class Period, DBSI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. DBSI often purposely

executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of DBAG.

64.    Defendants DBAG and DBSI are referenced collectively in this Complaint as "Deutsche Bank."

65.    Deutsche Bank regularly transacts business in and has substantial contacts with New York, New York. As discussed above, DBAG is licensed by the NYDFS with a registered address in New York, New York. In addition, DBAG has a regional head office, and hundreds of employees located in New York, New York. As discussed above, DBSI has its principal place of business in New York, New York. DBAG and DBSI both participated in USD SSA bond trading indirectly with members of the Class located in New York, New York during the Class Period.

66.    **HSBC.** Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is an indirect subsidiary of HSBC Holdings plc. According to FCA and FINRA records, colluding SSA bond trader Defendant Amandeep Singh Manku was registered as an adviser to perform controlled functions or otherwise act on HSBC USA's behalf during the Class Period, which included pricing, promoting, and executing USD SSA bond trades with members of the Class. HSBC USA executed USD SSA bond trades indirectly with members of the Class during the Class Period. As detailed more fully below, during the Class Period, HSBC USA (acting at least through Manku, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading

broker. HSBC USA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of HSBC Bank plc.

67.     Defendant HSBC Bank plc ("HSBCB") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of HSBC Holdings plc. HSBCB has at least one branch located in New York. HSBCB's trading desk is responsible for market making and the trading of USD SSA bonds. According to FCA records, colluding SSA bond trader Defendant Amandeep Singh Manku was registered as an adviser to perform controlled functions or otherwise act on HSBCB's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, HSBCB (acting at least through Manku, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. HSBCB often directed and controlled the trading of USD SSA bonds by HSBC USA and booked the profit from such trades.

68.     Defendants HSBC USA and HSBCB are referenced collectively in this Complaint as "HSBC." HSBC is considered a top-tier dealmaker for SSA bonds and has taken "the top spot in global SSA volumes" as recently as 2015. HSBC's team, including salespeople and traders, offered multiple services for SSA bond markets, often from the United States, including in this District. HSBC regularly transacts business in and has substantial contacts with New York, New York, and HSBC USA has its principal place of business in New York, New York. In addition, HSBC USA and HSBCB both participated in USD SSA bond trading indirectly with members of the Class located in New York, New York, during the Class Period.

69. **JPMorgan.** Defendant JPMorgan Chase & Co. ("JPMC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 270 Park Avenue, 38th Floor, New York, New York 10017.

70. Defendant J.P. Morgan Securities LLC ("JPMS") (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. JPMS is a financial services company with its principal place of business in New York, New York.

71. Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

72. Defendant J.P. Morgan Clearing Corp. ("JPMCC") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York.

73. As used herein, the term "JPMorgan" includes Defendants JPMC, JPMS, JPMCB, and JPMCC, and their subsidiaries and affiliates that that bought SSA Bonds and traded in the United States, including as a dealer. During the Class Period, JPMorgan bought SSA Bonds, both on its own behalf and on the behalf of its indirect purchaser customers. During the Class Period, JPMorgan engaged in a collective boycott within this District to prevent the emergence of an electronic, all-to-all electronic trading platform in the secondary market for SSA Bonds.

74. JPMorgan regularly transacts business in and has substantial contacts with New York, New York. As discussed above, JPMC, JPMS, JPMCB, and JPMCC each have their principal place of business in New York, New York, and JPMS is registered as a primary dealer

with the New York Fed. In addition, JPMC, JPMS, JPMCB, and JPMCC both participated in USD SSA bond trading indirectly with members of the Class located in New York, New York, during the relevant period.

75.     **Nomura.** Defendant Nomura Securities International, Inc. ("NSII") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. NSII executed USD SSA bond trades indirectly with members of the Class during the Class Period. As detailed more fully below, during the Class Period, NSII directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. NSII often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of Nomura International plc.

76.     Defendant Nomura International plc ("NIPLC") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom. NIPLC has at least one employee based in New York and doing business on its behalf. According to FCA records, colluding SSA bond trader Defendant Bhardeep Heer was registered as an adviser to perform controlled functions or otherwise act on NIPLC's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, NIPLC (acting at least through Heer, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. NIPLC often directed and controlled the trading of USD SSA bonds by NSII and booked the profit from such trades.

77.    Defendants NSII and NIPLC are referenced collectively in this Complaint as "Nomura."

78.    Nomura regularly transacts business in and has substantial contacts with New York, New York, and NSII and NIPLC both participated in USD SSA bond trading indirectly with members of the Class located in New York, New York, during the Class Period.

79.    **RBC.** Defendant Royal Bank of Canada is a Canadian company with its principal place of business in Toronto, Canada. Royal Bank of Canada has nine offices in the United States, of which four are federally licensed. Three of Royal Bank of Canada's branches are located in New York. Each of Royal Bank of Canada's New York locations are licensed and supervised as federal branches by the Office of the Comptroller of the Currency.[15] Royal Bank of Canada's stock is listed on the New York Stock Exchange, and at least three members of Royal Bank of Canada's Board of Directors reside in New York. Royal Bank of Canada and its subsidiaries employ approximately 8,000 individuals in the United States. Royal Bank of Canada has reported that its mission in the United States is "to be the preferred partner to corporate, institutional and high net worth clients and their businesses," and in 2016, 22% of Royal Bank of Canada's revenue came from operations in the United States.[16]

80.    According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on Royal Bank of Canada's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, Royal Bank of Canada (acting at least through Pau, but likely many

---

[15] Royal Bank of Canada, *Form 40-F*, at 7 (Nov. 30, 2016).
[16] Royal Bank of Canada, *Annual Report 2016*, at 1-2 (2016).

additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. Royal Bank of Canada often directed and controlled the trading of USD SSA bonds by RBC Capital Markets, LLC and booked the profit from such trades.

81.    Defendant RBC Capital Markets, LLC ("RBCCM") (formerly RBC Capital Markets Corp.), is a Minnesota limited liability company with its headquarters in New York, New York. According to FINRA records, colluding SSA bond trader Defendant Shailen Pau acted on RBC Capital Markets Corp.'s behalf (before it was renamed RBCCM) during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. At all relevant times, RBCCM has been a wholly owned indirect subsidiary of the Royal Bank of Canada. As detailed more fully below, during the Class Period, RBCCM directed its USD SSA bond trading activities to the United States, including by serving as a trading broker. RBCCM often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of Royal Bank of Canada and/or RBCEL.

82.    Defendant RBC Europe Limited ("RBCEL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Royal Bank of Canada. According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on RBCEL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, RBCEL (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States,

including to New York in particular, and engaged in these activities in the United States, including in New York. RBCEL often directed and controlled the trading of USD SSA bonds by RBCCM and booked the profit from such trades.

83.    Defendants Royal Bank of Canada, RBCCM, and RBCEL are referenced collectively in this Complaint as "RBC."

84.    RBC regularly transacts business in and has substantial contacts with New York, New York. As discussed above. Royal Bank of Canada has three branches, at least three members of its Board of Directors, and hundreds of employees located in New York. RBCCM has its headquarters in New York, New York. In addition. Royal Bank of Canada, RBCCM, and RBCEL each participated in USD SSA bond trading indirectly with members of the Class located in New York, New York during the Class Period.

85.    **TD Bank.** Defendant The Toronto-Dominion Bank is a corporation organized and existing under the laws of Canada, with its headquarters in Toronto, Canada. The Toronto-Dominion Bank has two locations in the United States, one of which is in New York. In 2016, The Toronto-Dominion Bank reported total revenue from U.S. operations of C\$12,217 billion (\$10.02 billion), which represented 36% of the company's total revenue for the year.[17] The Toronto-Dominion Bank is listed on the New York Stock Exchange, and at least one member of its Board of Directors resides in New York.

86.    According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on The Toronto Dominion Bank's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more

---

[17] The Toronto-Dominion Bank. *Annual Report 2016,* at 192 (2017).

fully below, during the Class Period, The Toronto-Dominion Bank (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. The Toronto-Dominion Bank often directed and controlled the trading of USD SSA bonds by TD Securities (USA) LLC and booked the profit from such trades.

87.     Defendant TD Securities Limited ("TDSL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of The Toronto-Dominion Bank. TDSL has branches in New York and Texas. According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on TDSL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades indirectly with members of the Class. As detailed more fully below, during the Class Period, TDSL (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. TDSL often directed and controlled the trading of USD SSA bonds by TD Securities (USA) LLC and booked the profit from such trades.

88.     Defendant TD Securities (USA) LLC ("TDS USA") is a Delaware limited liability company with its principal place of business in New York, New York, and is an indirect subsidiary of The Toronto-Dominion Bank. TDS USA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of The Toronto-Dominion Bank and/or TDSL.

89.    Defendants The Toronto-Dominion Bank, TDSL, and TDS USA are referenced collectively in this Complaint as "TD Bank."

90.    TD Bank regularly transacts business in and has substantial contacts with New York, New York. As discussed above, The Toronto-Dominion Bank has a branch and at least one member of its board of directors located in New York, New York, and is listed on the New York Stock Exchange. TDS USA has its principal place of business in New York, New York. In addition, The Toronto-Dominion Bank, TDSL, and TDS USA each participated in USD SSA bond trading indirectly with members of the Class located in New York, New York, during the Class Period.

91.    **UBS**. Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York, and Stamford, Connecticut.

92.    Defendant UBS Securities LLC ("UBS Securities") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of UBS AG. UBS Securities is a registered primary dealer for SSA bonds with the New York Fed.

93.    As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities, and their subsidiaries and affiliates that bought USD SSA bonds and traded in the United States, including as a dealer. During the Class Period, UBS bought USD SSA bonds, both on its own behalf and on the behalf of its indirect purchaser customers, and both participated in USD SSA bond trading indirectly with members of the Class located in New York, New York, during the relevant period.

94.    UBS regularly transacts business in and has substantial contacts with New York, New York. For instance, UBS AG has located a major branch office, which serves as one of its U.S. headquarters, in New York, New York. As discussed above, UBS Securities has its principal place of business in New York, New York, and is registered as a primary dealer with the New York Fed. In addition, UBS AG and UBS Securities USD SSA both participated in bond trading indirectly with members of the Class located in New York, New York, during the relevant period.

### 2. *Individual Defendants*

95.    Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, England. During the Class Period, Gudka purchased and sold SSA bonds. During the Class Period, Gudka was an SSA bond trader employed by Defendants Bank of America and Deutsche Bank. As noted above, Gudka is under investigation by DOJ concerning his SSA bond trading activities.

96.    Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex, England. During the Class Period, Heer purchased and sold SSA bonds. During the Class Period, Heer was an SSA bond trader employed by Nomura. As discussed more fully below, during the Class Period, Heer directed his USD SSA bond trading activities to the United States and New York in particular. On multiple occasions during the Class Period, Heer traveled to New York to visit with his New York accounts, promote his USD SSA bond trading services, and maintain relationships with his New York-based customers for USD SSA bonds. He promoted and priced USD SSA bonds to and for U.S.-based investors and engaged in trades of USD SSA bonds in the United States and New York at artificial prices due to the conspiracy.

97.    Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex, England. During the Class Period, Manku purchased and sold SSA bonds. During the Class Period, Manku was an SSA bond trader employed by Bank of America and Credit Agricole. Manku was previously a broker registered with FINRA (CRD #4730575). As noted above Manku is under investigation by the DOJ concerning his SSA bond trading activities.

98.    Defendant Gary McDonald ("McDonald") is an individual residing in London, England. During the Class Period, McDonald was an SSA bond trader employed by or acting on behalf of Bank of America (BAMLIL, BANA), Citi (CGML, Citibank), and TD Bank (TDSL, The Toronto-Dominion Bank), and had close ties to Gudka. During the Class Period, McDonald directed his USD SSA bond trading activities to the United States and New York.

99.    Defendant Shailen Pau ("Pau") is an individual residing in London, England. During the Class Period, Pau purchased and sold SSA bonds. During the Class Period, Pau was an SSA bond trader employed by Credit Suisse and Credit Agricole. On multiple occasions during the Class Period, Pau traveled to New York to visit with his New York accounts, promote his USD SSA bond trading services, and maintain relationships with his New York-based customers for USD SSA bonds. He promoted and priced USD SSA bonds to and for U.S.-based investors and engaged in trades of USD SSA bonds in the United States and New York at artificial prices due to the conspiracy.

100.    Pau was previously a broker registered with FINRA (CRD #4439683). Pau worked with his New York-based sales affiliates to generate business in the USD SSA bond market, worked directly with a New York fund, and traveled to New York for business purposes.

101.    Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made

statements that aided-and-abetted and were in furtherance of the unlawful conduct alleged herein.

## IV.     THE MARKET

### A.     The SSA Bond Market

102.     The SSA bond market is the market in which bonds issued by supranational institutions, sub-sovereign entities, and government agencies are bought and sold. Overall, estimates of the global SSA bond market range from $9 to $15 trillion.  Global SSA issuance volumes in 2015 alone reached over $843 billion.

### B.     SSA Issuers

103.     Supranational bond issuers are large, multilateral institutions with shareholders from several countries and global economic mandates.  Examples include the International Bank for Reconstruction and Development ("IBRD") and the International Finance Corporation ("IFC") of the World Bank Group; the European Investment Bank ("EIB"); and the African and Asian Development Banks ("AFDB" and "ADB," respectively).  Sub-sovereign bond issuers are state-level entities sitting one level below a sovereign government.  Examples of sub-sovereign issuers include Germany's states and Canada's provinces.  Agency bond issuers include subdivisions of a sovereign state or other institutions that perform tasks on behalf of a governing sovereign such as Fannie Mae and Freddie Mac in the United States.  SSA bond issuers include Germany's Kreditanstalt für Wiederaufbau ("KfW"), France's Caisse d'Amortissement de la Dette Sociale ("CADES"), and Spain's Instituto de Credito Oficial ("ICO").

104.     These and other SSA institutions issue debt on a regular basis to raise capital needed to fund global, continental, and regional projects and development programs.

C.    **Issuance of SSA Bonds**

105.    SSA bonds are regarded as secure investments because they are explicitly or implicitly guaranteed by the related issuer, an entity so large that its creditworthiness is not practically in question.  SSA bonds occupy an important segment of the broader bond market, sitting between sovereign government issuers (*e.g.*, U.S. Treasury bonds) on the one hand and private credit issuers (*e.g.*, corporate bonds) on the other.

106.    Unlike Treasury bonds, which are often issued through auctions, SSA bonds are typically issued through syndication.  In a syndication, if an SSA institution wants to issue bonds, it will find a bank or group of banks to underwrite its bond issue and sell those bonds to investors. The banks are responsible for finding investors to purchase the bonds at the time of issuance and also for pricing the bonds.

107.    Issuers determine the currency in which an SSA bond issue will be denominated. The U.S. dollar-denominated segment of the SSA market is attractive to investors looking for high-quality bonds with higher yields than U.S. Treasuries.  U.S. agency bond issuances (which are always dollar-denominated) have averaged around $400 billion annually, and dollar-denominated supranational and sub-sovereign issuances have averaged around $300 billion per year.

108.    After a syndication of U.S. dollar-denominated bonds is put together, the bonds are sold to investors principally in the United States and Europe.

109.    As the Defendant banks underwrite SSA issuances, they often purchase large quantities of the initial issuance of bonds.  According to the World Bank, one of the largest SSA

issuers, banks including the Defendants accounted for more than 28% of all SSA bond purchases (and over 25% of AAA-rated supranational issuances) in 2013-14.[18]

**D.**    **The Secondary SSA Bond Market**

110.    Customers who wish to purchase SSA bonds other than at the time of issuance must buy them on the secondary market.  And because Defendants are both the underwriters for SSA bond issuances and the primary dealers for SSA bond trading, customers have no choice but to deal with the Defendants.

111.    Plaintiff and the members of the Proposed Class are participants in the secondary SSA bond market.

112.    Trading in the SSA secondary market is done over-the-counter, *i.e.*, directly with a counterparty.  In limited instances, U.S. agency bonds are also traded over electronic trading platforms.  The Defendants act as dealers in this market:  they provide liquidity or "make markets" by being willing to continuously buy and sell SSA bonds.

113.    A dealer in the SSA market quotes prices at which it stands ready to buy or sell SSA bonds.  When a customer looks to buy or sell a bond, it asks a dealer for a quote.  A quote consists of a "bid" and an "ask" on a particular SSA bond.  The "bid" is the price at which the dealer is willing to buy the specific SSA bonds.  The "ask" is the price at which the dealer is willing to sell the indicated SSA bonds.  The difference or margin between the bid and ask is the "bid-ask spread."  The bid-ask spread is the dealers' compensation.

114.    Bid-ask spreads are the primary way banks compete against each other for customers.  Customers want narrower spreads, meaning, they want to buy bonds for less and sell

---

[18] *See* http://www.gioa.us/presentations/2014/2014_World%20Bank_Richardson_ Jefferies_Kim.pdf.

them for more.  By quoting narrower spreads, Defendants can win sales, gain customers, and build market share.  Conversely, widening spreads results in losses to consumers.

115.    Customers generally execute SSA transactions either by telephone or electronic message to a trader at a dealer bank, or through an electronic trading platform.  A dealer-to-client electronic trading platform is a computer system that customers can use to execute orders with dealers over network. Electronic trading platform include single-bank systems and multi-bank dealer platforms such as MarketAxes, TradeWeb, Bloomberg Bond Trades, and MTS Bondvision.  Regardless of whether customers transact through telephone, electronic message, or electronic trading platform, the system is the same:  a customer requests a quote from a dealer, which in turn provides a bid-ask quote to the customer.

### V.    DEFENDANTS CONSPIRE TO FIX THE SPREAD OF SSA BONDS

116.    Beginning at least as early as January 1, 2010, Defendants conspired on a daily basis to fix spreads in the SSA market.  The conspiracy was targeted at inflating bid-ask spreads.

117.    According to industry insiders, despite its vast size, the SSA market is a "small world."  London SSA traders are a tight-knit community, and they regularly socialize at events hosted by issuers and brokers, who facilitate trades between banks.  The collegial nature of the SSA bond market enabled Defendants' conspiracy by providing Defendants with ample opportunity to collude.

118.    In addition to communicating via telephone and in person, top-level traders on Defendants' SSA desks used electronic communications, including chat rooms, to meet and conspire to manipulate and inhibit price competition and maximize bid-ask spreads.

119.    In the primary issuance market, information was shared freely in chat rooms among the banks within the underwriting syndicates for new issuances.  Members of each bank's

sales, syndicate, and trading desks were present in these chats. Traders from multiple banks had full access to the order book on each deal, and were part of discussions about the price at which newly issued bonds should trade in the secondary market, creating a shared base of knowledge among bond traders that was highly conducive to collusion. As one trader noted, "once banks are mandated [to underwrite an issuance] they have to work together . . . . Given the collegia[l] nature, people might talk about things that they shouldn't."[19]

120.    In the secondary market, access to chat rooms was restricted to traders at the Defendant banks. Defendants' traders attempted to avoid detection by constantly creating new chat rooms. One SSA bond trader interviewed stated that bond traders "created a new chatroom each day to discuss activity and prices."[20]

121.    In these chat rooms, Defendants conspired to fix prices through a number of collusive tactics aimed at taking advantage of their clients. Defendants' traders regularly shared confidential client information about client orders. Defendants have a number of regular customers with predictable, large SSA bond transactions. With knowledge of their clients' portfolios and trading patterns, Defendants conspired to plan trading strategies and set spreads. Upon receiving customers' requests for quotes, Defendants shared specific bond and volume information with their competitors.

122.    After receiving customers' orders, Defendants utilized chat rooms to conspire to inhibit price competition and maximize bid-ask spreads. Defendants regularly agreed with each other on who would offer price quotes to potential buyers and sellers of bonds. As part of these

---

[19] Craig McGlashan, et al., *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, Global Capital (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39- to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal
[20] *Id.*

discussions, some Defendants agreed to withhold offering quotes to customers on certain SSA bonds.  In so doing, Defendants inhibited customers' ability to shop around for better prices.

123.    In addition to conspiring on who would offer prices, Defendants also conspired on the spreads that were offered to customers.  Defendants agreed that they would offer the same or substantially similar spreads to potential buyers and sellers of SSA bonds.  The bid-ask spreads that were quoted to customers were, as a result of these agreements, artificially inflated.  That is, Defendants quoted artificially high asks on certain bonds and artificially low bids on those same bonds in order to maximize their spreads to the detriment of the Class.  As one SSA bond trader stated:  "if you can speak to another trader and agree to sell a bond at a certain price and not below, then that makes a big difference."[21]

124.    The inflated bid-ask spreads in the syndications through which SSA bonds are sold in the primary market are used to set the prices that purchasers pay in the secondary market.  The only way that purchasers in the secondary market can purchase bonds originally purchased in the primary market are through those who purchased them at syndication.  The price paid by purchasers in the primary market is a component of the price offered to purchasers in the secondary market like Plaintiff and members of the Proposed Class.

125.    As a direct and proximate result of the conspiracy, Plaintiff and each Class member transacted in artificially inflated bid-ask spreads on their SSA transactions with Defendants.  At the same time, Defendants reaped massive, supracompetitive profits on SSA trades that, if not for their conspiracy, would have had smaller margins.

---

[21] Ramarayan & Durand, *supra*.

## VI.    THE DEPARTMENT OF JUSTICE AND OTHER REGULATORS INVESTIGATE THE SSA SPREAD-FIXING CONSPIRACY

126.    Law enforcement authorities and regulatory agencies in the United States, United Kingdom, and European Union are actively investigating Defendants' conspiracy and have uncovered evidence of wrongdoing.  Chat room transcripts obtained by the DOJ as part of its investigation into manipulation of the SSA market and other benchmarks confirm that traders conspired to coordinate and fix SSA spreads at artificially high levels.

127.    On December 9, 2015, *Bloomberg* first reported that the DOJ had launched an investigation into possible collusion in the SSA market, "focusing on activity by London-based traders."[22]  A month later, on January 6, 2016, the *Financial Times* and *International Financing Review* confirmed the DOJ's probe, the latter indicating that the DOJ was looking at "possible manipulation of bond prices."[23]

128.    Initial reports state that the DOJ learned of Defendants' wrongdoing when trader chat transcripts were turned over to the DOJ as part of the settling banks' LIBOR and FX investigations and that the DOJ's focus is trading in the SSA secondary market.  According to the *International Financing Review* report, the DOJ "is investigating allegations that SSA traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chat rooms they established for the purpose."[24]  According to the *Bloomberg* report, DOJ "[p]rosecutors have obtained transcripts of online chat-room conversations indicating possible misconduct and have contacted banks, asking them to delve further into the behavior."[25]  The

---

[22] David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, Bloomberg (Dec. 9, 2015), at http://www.bloomberg.com/news/articles/2015-12-09/u-s-said-to-probe-possible-rigging-in-agency-bond-market.

[23] Ramarayan & Durand, *supra*.

[24] *Id.*

[25] McLaughlin & Schoenberg, *supra*.

DOJ has sent information requests to Bank of America, Crédit Agricole, Credit Suisse, and Nomura, among others.[26]

129.    On January 20, 2016, *Bloomberg* reported that the U.K. Financial Conduct Authority, which previously had been assisting the DOJ, had started its own investigation into collusion in the SSA market.[27]    On February 9, 2016, the *Financial Times* reported that in addition to the DOJ and Financial Conduct Authority, the European Commission ("EU") had also opened a cartel investigation into possible collusion in the SSA market.[28] On December 20, 2018, the EU sent Deutsche Bank AG, Credit Suisse Group AG and Credit Agricole SA antitrust complaints, saying they had preliminarily concluded the banks breached European competition laws by exchanging "commercially sensitive information and coordinated on prices" on trading of U.S. dollar supra-sovereign, sovereign and agency bonds via online chatrooms between 2009 and 2015.[29] Getting a statement of objections from the EU is usually a precursor to potential fines. Companies can seek to argue their defense in writing or at an oral hearing but it is rare for the EU to drop a case or avoid levying fines for cartel behavior after it sends the formal complaint.[30]

---

[26]  Craig McGlashan, Owen Sanderson, Ralph Sinclair, & Toby Fildes, *Scandal rocks SSA market*, Global Capital (Jan. 7, 2016), at www.globalcapital.com/article/vydmn22frhms/ trading-scandal-rocks-ssa-market.

[27]  Ring & Schoenberg, *supra*.

[28]  Jim Brunsden, *EU probes suspected rigging of $1.5tn debt market*, Financial Times (Feb. 9, 2016), at https://next.ft.com/content/04befd8a-cf35-11e5-92a1-c5e23ef99c77.

[29]  See https://www.bloomberg.com/news/articles/2018-12-20/four-banks-targeted-by-eu-antitrust-objections-over-ssa-bonds (last viewed February 1, 2019).

[30]  *Id.*

## VII.    DEFENDANTS SUDDENLY REMOVE THEIR HEADS OF SSA TRADING

130.    Confirming their involvement in wrongdoing and the seriousness of the investigations into Defendants' conspiracy, Defendants have terminated or suspended employees on their SSA trading desks that participated in the conspiracy.

131.    In late 2015, Bank of America suspended or terminated Gudka, its head of SSA trading.  Gudka had previously worked at Deutsche Bank, where he participated in chat room discussions as part of Deutsche Bank's SSA trading desk until his departure in April 2014. Gudka has been inactive on the FCA register for traders since the start of December 2015. According to one head bond trader who was interviewed, Gudka was "a big name" in SSA bond trading and ran one of the largest SSA trading books in the market.[31]

132.    In late 2015, Credit Suisse suspended or terminated SSA bond trader Pau.  Pau previously worked at Crédit Agricole from 2009 to 2010; he has been inactive on the FCA register for traders since March 2016.

133.    In late 2015, Crédit Agricole suspended or terminated SSA bond trader Manku. Manku has been inactive on the FCA register for traders since the start of December 2015. Manku was previously employed at Bank of America as recently as 2012 and at HSBC until at least 2009.

134.    In late 2015, Nomura suspended SSA bond trader Heer, who was removed from Nomura's trading desk and moved to a back-office role indefinitely.  He has been inactive on the FCA register for traders since March 2016.

---

[31] Craig McGlashan, et al., *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, Global Capital (Jan. 7, 2016), at http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal.

135.    At the time of their departures, Gudka, Manku, Heer, and Pau were all under investigation by the DOJ for possible manipulation of SSA debt prices.[32]

## VIII.    DEFENDANTS' CONDUCT IS THE LATEST EXAMPLE OF CORRUPTION IN THE FINANCIAL SYSTEM

136.    The government investigations into the Defendant banks' SSA trading practices are just the latest in a long string of revelations about corruption in our financial system.

### A.    Investigations into the Rigging of Libor

137.    One of the first financial benchmarks to draw scrutiny from government regulators was the London Interbank Offered Rate ("Libor"), which was supposed to reflect the rate that banks would pay to borrow funds in the inter-bank market.  Following reports in the media that Libor had been manipulated—based on the use of economic "screens" highly similar to the ones used herein—regulators launched investigations into the conduct of the group of "panel banks" responsible for setting Libor.[33]

138.    Those investigations have revealed that instead of submitting their honest, expected borrowing costs, the Libor panel banks instead submitted deliberately false quotes for the purpose of manipulating the published Libor rate.  The government investigations have resulted in both criminal and regulatory charges, and have been coordinated between agencies from the United States, the United Kingdom, Canada, Japan, and the European Union.

139.    The first panel bank to be formally charged was Barclays.  In June 2012, Barclays was fined over $450 million by the CFTC, DOJ, and U.K. Financial Services Authority ("FSA").

---

[32] Ramarayan & Durand, *supra*.
[33] Rosa Abrantes-Metz, *How to Use Statistics to Seek Out Criminals*, Bloomberg (Feb. 26, 2013), at http://www.bloomberg.com/news/2013-02-26/how-to-use-statistics-to-seek-out-criminals.html.

Barclays admitted to a detailed Statement of Facts, which cited scores of emails and electronic chat messages in which traders schemed to manipulate Libor rates.[34]

140.    Later that year, the scandal widened when, for the first time, it was revealed that Libor manipulation was not restricted to traders within the panel banks, but also involved collusion *between* banks, and between banks and interdealer brokers.  This revelation occurred in connection with UBS's settlement agreements, wherein UBS was fined over $1.5 billion for its role in manipulating Libor rates.  Regulators found "[m]ore than 2,000 instances of unlawful conduct involving dozens of UBS employees, colluding with other panel banks, and inducing interdealer brokers to spread false information and influence other banks," including thousands of requests to manipulate Libor in emails and electronic chat messages.[35]

141.    The Royal Bank of Scotland ("RBS") was the next bank to fall.  In early 2013, it was charged with felony counts of wire fraud and price-fixing in violation of the Sherman Act. RBS admitted that it colluded with other banks to manipulate Libor rates.  In addition to the $250 million in criminal fines imposed by the DOJ, RBS agreed to pay $325 million in fines and disgorgement to the CFTC, and $137 million to the FSA.  Those regulators released many specific examples of RBS's collusive communications—including in the form of emails and instant chat messages—between traders at RBS and other panel banks.  As stated before British Parliament by Johnny Cameron, RBS's former Chairman of Global Banking and Markets, Libor manipulation involved "a cartel of people across a number of banks."[36]

---

[34]    DOJ, Barclays Statement of Facts (Jun. 26, 2012), at http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf.

[35] CFTC, Press Release, *CFTC Orders UBS to Pay $700 Million Penalty to Settle Charges of Manipulation, Attempted Manipulation and False Reporting of Libor and Other Benchmark Interest Rates* (Dec. 19, 2012), at http://www.cftc.gov/PressRoom/ PressReleases/pr6472-12.

[36] Parliamentary Commission on Banking Standards—Minutes of Evidence (Feb. 11, 2013), at http://www.publications.parliament.uk/pa/jt201314/jtselect/jtpcbs/27/ 130211a.htm.

142.    On December 4, 2013, the European Commission issued its own set of findings, and fined Barclays, Citigroup, Deutsche Bank, JPMorgan, and RBS a total of $1.7 billion for "participating in cartels in the interest rate derivatives industry."[37]  The European Commission found that each of these Defendants "coordinated with each other" to manipulate Libor and related benchmarks, which included discussions of "confidential and commercially sensitive information that they are not allowed to share with other market players" and that they "exchanged their pricing and trading strategies and trading positions."[38]

143.    More recently, Defendant Deutsche Bank was charged with felony counts of wire fraud and price-fixing, and agreed to pay $625 million in fines to the DOJ.[39]  The DOJ found that Deutsche Bank conspired with other banks to manipulate Libor.  Deutsche Bank was also fined $800 by the CFTC, $344 million by the FSA, and $600 million by the New York Department of Financial Services.

## B.    Investigations into the FX Market

144.    Beginning in the fall of 2013, media reports surfaced that government regulators were investigating potential manipulation of the FX market.  These investigations quickly grew in scope to include authorities from across the globe.  Again, many of these claims were uncovered in part through econometric analysis of the type performed here, *i.e.*, an analysis of trading patterns and price movements.

---

[37]  European Commission, Press Release (Dec. 4, 2013), at http://europa.eu/ rapid/press-release_IP-13-1208_en.htm.

[38]  Joaquín Almunia, *Introductory Remarks on Cartels in the Financial Sector* (Dec. 4, 2013), at http://europa.eu/rapid/press-release_SPEECH-13-1020_en.htm, at 2.

[39]  DOJ, Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of Libor (Apr. 23, 2014), at http://www.justice.gov/ opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running- manipulation.

145.    In May 2015, Barclays, Citi, JPMorgan, RBS, and UBS were fined a total of $3 billion by the DOJ, and each pled guilty to criminal conspiracy charges for manipulating FX rates.[40] The DOJ settlements followed a series of Orders from November 2014, where the CFTC and FCA imposed over $3.2 billion in fines on Citi, HSBC, JPMorgan, RBS, and UBS for manipulating the FX market, the Office of the Comptroller of the Currency ("OCC") fined Bank of America, Citi, and JPMorgan another $950 million, and the Financial Market Supervisory Authority ("FINMA") fined UBS $141 million.  Other authorities across the globe are also actively investigating Defendants' manipulation of the FX market, including the U.S. Federal Reserve and the Securities Exchange Commission.

146.    The settlements entered to date lay out the details of how Defendants colluded to manipulate FX prices to their benefit.  For instance, the CFTC found that Citi, HSBC, JPMorgan, RBS, and UBS "used private electronic chat rooms to communicate and plan their attempts to manipulate the Forex benchmark prices."[41] Defendants' traders used those inter-bank chat rooms to "coordinate[] their trading with certain FX traders at other banks to attempt to manipulate certain FX benchmark rates," and to "disclose[] confidential customer order information and trading positions, alter[] trading positions to accommodate the interests of the collective group, and agree[] on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates."[42]  Those exclusive chatrooms were often given colorful names like "The

---

[40]  *See U.S. v. Barclays PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. Citicorp*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. JPMorgan Chase & Co.*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. The Royal Bank of Scotland PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. UBS AG*, Plea Agreement (D. Conn. May 20, 2015); *In the Matter of Barclays Bank PLC*, CFTC Docket No. 15-24, Order Instituting Proceedings (May 20, 2015).

[41] *In the Matter of Citibank, N.A.*, Order Instituting Proceedings, CFTC Dkt. No. 15-03 (Nov. 11, 2014).

[42] *Id.*

Cartel," "The Mafia," "The Club," "The Bandits' Club," "The Dream Team," "One Team, One Dream," and "The Sterling Lads."[43]

147.    As discussed above, Defendants here engaged in similar practices in the analogous context of the SSA market.  SSA traders employed by Defendants used the same types of private electronic chat-rooms to communicate with their counterparts at other banks, including communicating the details about their clients' portfolios and orders.

### C.    Investigations into the Manipulation of ISDAfix

148.    ISDAfix is another key interest-rate benchmark, designed to represent current market fixed rates for interest rate swaps of various terms.

149.    In 2013, it was revealed that the CFTC,[44] the U.K. Financial Conduct Authority,[45] and the German financial regulator BaFin[46] were actively investigating the manipulation of ISDAfix rates.[47]  The CFTC was reported to be sifting through over one million emails and instant messages, as it simultaneously interviewed current and former employees of banks and dealers as part of its ISDAfix investigation.[48]

---

[43] *Id.*

[44] Matthew Leising, *CFTC Said to Subpoena ICAP Brokers, Dealers on Swap Prices*, Bloomberg (Apr. 8, 2013), at http://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to- probe-icap-treasure-island-brokers-on-swap-prices.

[45] Lindsay Fortado & Matthew Leising, *U.K. Regulator Said to Join CFTC in ISDAfix Manipulation Probe*, Bloomberg (Apr. 23, 2013), at http://www.bloomberg.com/news/articles/2013-04-23/u-k-regulator-said-to-join-cftc-in-isdafix-manipulation-probe

[46] Matthew Leising, *Libor Settlements Said to Ease CFTC Path in Rate-Swaps Probe*, Bloomberg (Aug. 7, 2013), at http://www.bloomberg.com/news/articles/2013-08-06/libor- settlements-said-to-ease-cftc-s-path-in-rate-swaps-probe.

[47] Matthew Leising, *CFTC Said to Subpoena ICAP Brokers, Dealers on Swap Prices*, Bloomberg (Apr. 8, 2013), at http://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to- probe-icap-treasure-island-brokers-on-swap-prices.

[48] Matthew Leising, *CFTC Said Preparing ISDAfix Probe Talks in Weeks: Credit Markets*, Bloomberg (May 21, 2013), at http://www.bloomberg.com/news/articles/2013-05-20/cftc-said-to-review-1-million-e-mails-in-isdafix-investigation

150.    In 2014, *Bloomberg* reported that the CFTC had told the DOJ that it had "found evidence of criminal behavior following an investigation into banks' alleged manipulation of ISDAfix[.]"[49]  The article stated that the CFTC "has flagged its findings to prosecutors, according to a person familiar with the matter."[50]  This led the DOJ and other regulators to launch their own investigations.

151.    In May 2015, Barclays reached an agreement with the CFTC to pay $115 million for alleged manipulation of ISDAfix.[51]  In May 2016, Citibank reached a similar agreement with the CFTC, agreeing to pay $250 million for alleged manipulation of ISDAfix.[52]  That same month, seven of the world's largest banks—including Bank of America, Credit Suisse, and Deutsche Bank, Defendants this action—agreed to pay $324 million to private antitrust claims alleging that they conspired to rig ISDAfix rates.[53]

## D.    Investigations into the Rigging of Treasuries Auctions

152.    On June 8, 2015, the New York Post first reported that the DOJ had begun an investigation into possible fraudulent manipulation of the Treasuries market.[54]  Two days later,

---

[49] Matthew Leising & Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, Bloomberg (Sept. 9, 2014), at http://http://www.bloomberg.com/ news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.
[50] *Id.*
[51] CFTC Press Release, *CFTC Orders Barclays to Pay $115 Million Penalty for Attempted Manipulation of and False Reporting of U.S. Dollar ISDAFIX Benchmark Swap Rates* (May 20, 2015), at http://www.cftc.gov/PressRoom/PressReleases/pr7180-15.
[52] CFTC Press Release, *CFTC Orders Citibank to Pay $250 Million Penalty for Attempted Manipulation of and False Reporting of U.S. Dollar ISDAFIX Benchmark Swap Rates* (May 25, 2016), at http://www.cftc.gov/PressRoom/PressReleases/pr7371-16.
[53] Bob Van Voris, *Seven Banks to Pay $324 Million to Resolve ISDAfix Claims*, Bloomberg, at http://www.bloomberg.com/news/articles/2016-05-03/seven-banks-to-pay-324-    million-to-resolve-isdafix-claims
[54] *See* Dugan, *supra*.

*Bloomberg* confirmed that to be the case,[55] with subsequent reports revealing that "most or all" of the 22 primary dealers in U.S. Treasuries had received information requests from the DOJ's fraud section.[56]

153.    The focus of the probe is reported to be the auction process, with Defendant Goldman Sachs recently confirming it received requests from regulators for information regarding "[t]he offering, auction, sales, trading and clearance of . . . government securities."[57] Initial reports also state that the DOJ is modeling the Treasuries investigation on its successful examinations of the FX and other financial markets, including by inquiring whether inside information was shared improperly—*e.g.*, whether Defendants used electronic chat-rooms and similar means to coordinate their positions and exchange confidential customer information, just as they did in the FX and other markets.[58]  Several people familiar with the Treasury auction process informed *Bloomberg* "traders at some of these dealers also have talked with counterparts at other banks via online chatrooms . . . with one of them adding that the traders swapped gossip about clients' Treasury orders as recently as last year."[59]

154.    On September 9, 2015, the *Financial Times* and *Reuters* revealed that the New York Department of Financial Services ("DFS") had joined the DOJ by commencing its own probe.  DFS is reported to have sent letters to multiple banks—including Barclays, Defendant

[55] Keri Geiger & Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, Bloomberg (June 10, 2015), at http://www.bloomberg.com/news/ articles/2015-06-10/treasuries-collusion-said-to-be-hunted-in-next-wave-of-probes.
[56] Keri Geiger & Alexandra Scaggs, *U.S. Probes Treasuries Niche That Investors Claim Is Rigged by Big Banks*, Bloomberg (Nov. 9, 2015), at http://www.bloomberg.com/news/articles/2015-11-09/u-s-probes-treasuries-niche-that-some-investors-claim-is-rigged.
[57] Goldman Sachs Group, Inc., *Quarterly Report on Form 10-Q for the Quarter Ended September 30, 2015*, at 95, at https://www.sec.gov/Archives/edgar/data/886982/000119312515362853/d22013d10q.htm.
[58] *See* Scaggs, Kruger and Geiger, *supra*.
[59] *See id.*

Deutsche, Goldman Sachs, Societe General, Defendant Credit Suisse, Bank of Nova Scotia, Mizuho, and BNP Paribas—seeking information on potential manipulation of U.S. Treasuries auctions.[60]

155.    The government investigations into banks' SSA trading practices are just the latest in a long string of revelations about corruption in the financial system.  With each passing scandal, it becomes clear that these are not isolated events, but rather that "cross-talk" on electronic platforms, to arrange manipulative trading strategies at key points in the day, was for years viewed as normal operating procedure by Defendants and others in the banking industry.

## IX.    IMPACT ON INVESTORS IN THE U.S. AND IN NEW YORK

### A.    Defendants' Conspiracy Deliberately Targeted the United States and New York

156.    The fact that the DOJ has taken the worldwide lead on the investigation into Defendants' cartel underscores that Defendants deliberately directed their conspiracy to the United States. Defendants did so in part because U.S.-based investors are most likely to have U.S. dollars available to buy, hold, and trade USD SSA bonds. Defendants continuously and deliberately exploited the U.S. market for USD SSA bonds and U.S. investors. Defendants also knew that the brunt of the harm caused by their scheme would be felt by investors in the United States.

157.    Individual investors, pension funds, mutual funds, and domestic banks are among the entities that purchase USD SSA bonds (some of which are colloquially called "Yankee

---

[60] Karen Freifeld & Rachel Chitra, *New York seeks info from banks in Treasury auction probe*, Reuters (Sept. 9, 2015), at http://www.reuters.com/article/2015/09/09/ globalbanks-probe-idUSL4N11F48M20150909#IDXrxhEHgWrYeJJ5.97; Gina Chon & Martin Arnold, *Watchdog in US Treasury market probe*, Financial Times (Sept. 9, 2015), at http://www.ft.com/cms/s/0/ fbb913c2-5650-11e5-a28b-50226830d644.html.

bonds") within the United States. These entities are often mandated to invest a minimum percentage of assets under management in U.S. dollar-denominated assets, such as USD SSA bonds. USD SSA bonds are appealing to U.S.-based investors because they offer a unique combination of high credit quality, frequent backing by sovereigns, and higher yields than U.S. Treasuries. This is a primary reason that USD SSA bonds are typically issued in a format that allows for their immediate, or close to immediate, acquisition by U.S. investors.

158.    Within the United States, Defendants directed their conspiracy in particular to New York, which is where many of Defendants' customers, offices, and key employees were located; where Defendants often attended industry conferences and focused their marketing efforts for USD SSA bonds; and where their U.S.-based clients' investment managers were primarily located. Defendants extensively promoted USD SSA bonds to investors in the U.S. and in New York in several ways, soliciting business in order to capitalize on commissions and boost profits.

159.    First, every day, Defendants' USD SSA bond desks in London would circulate to their U.S.-based salespeople a list of their "runs" and "axes"—a summary list of SSA issuers' relevant bonds with indicative trading levels, as well as specific SSA bonds that Defendants would like to buy or sell. Using this information, these salespeople would then reach out to their U.S. clients to see if they could promote a trade. If the U.S.-based customer was interested in a particular bond or bonds, the Defendant's U.S.-based salesperson would then typically either contact the Defendant's London desk directly for a quote on the bond or contact a U.S.-based trader who would then contact the London desk. In distributing their "runs" and "axes" to their affiliated U.S.-based salespeople, Defendants knew and intended that they would be reviewed and acted upon by U.S.-based investors.

160.    Second, it was routine practice during the Class Period for the Dealer Defendants to communicate with U.S.-based investors through, among other things, a daily call during which SSA bond traders would give information to U.S. investors related to the performance of the SSA bond market. A foreign-based trader might give this information directly to U.S.-based customers, or the trader might relay the information through a U.S.-based trader that handles any bond inquiries that come during post-trading hours. This information is then distributed by U.S. salespeople to their U.S. customers. In this way, U.S.-based investors are kept up-to-date about the USD SSA bond market and can also use this as an opportunity to initiate trades.

## B.    Defendants Committed Specific Acts In Furtherance Of The Conspiracy In The United States And In New York

161.    During the Class Period, the conspiracy unfolded as follows:

1.    An investor located in the United States made an inquiry about particular USD SSA bonds;

2.    A salesperson or trader in the U.S. received the inquiry;

3.    The salesperson or trader asked one of the Dealer Defendants' London-based SSA bond traders for the price(s);

4.    Defendants' London-based SSA bond trader gave the U.S.-based salesperson or trader the price(s). The London-based traders and entities priced the trades, approved the trades, and had the power to cancel trades;

5.    The U.S.-based salesperson or trader conveyed the price(s) to the U.S.-based investor;

6.    The U.S.-based investor made the decision to buy or sell and relayed that decision to the U.S.-based salesperson or trader;

7.      The U.S.-based salesperson or trader relayed the U.S. investor's decision to the London-based trader; and

8.      The USD SSA bond trade was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to U.S.-based indirect investors, including Plaintiff.

162.    During the Class Period, each Defendant engaged in the conspiracy at one or more points in the chain. For example, the following Defendants at the very least received inquiries from and conveyed manipulated prices to U.S.-based investors while in the United States: BANA, BAMLI, BBPLC, BSL, BCSL, BNP Paribas, Citigroup, Citibank, CGML, Crédit Agricole, CSAG, CSSEL, CSI, DBAG, HSBCB, MLI, NIPLC, Royal Bank of Canada, RBCEL, TDSL, The Toronto-Dominion Bank, Hiren Gudka, Bhardeep Singh Heer, Amandeep Singh Manku, Gary McDonald, and Shailen Pau. The following Defendants at the very least executed USD SSA bond trades with U.S.-based indirect investors, including Plaintiff and Class Members, through, for example, funds in which their 401(k) accounts were invested:  BCI, BNP Securities, CGMI, CSSUSA, DBSI, HSBC USA, MLPF&S, NSII, RBCCM, and TDS USA.

163.    These essential steps in furtherance of the conspiracy often occurred in New York. Defendants' London-based SSA bond desks and traders were constantly receiving inquiries from and providing prices to traders and salespeople based in the U.S., including in New York. Any price for an SSA bond had to come through Defendants' London desks and there was a constant flow of market information to and from Defendants' U.S.- and New York-based salespeople and traders, and the London SSA desk.

164.    On information and belief, the other Defendants, all large players in their own right in this space, similarly engaged in many thousands of transactions effecting U.S.-based indirect investors, in the manner described herein.

## X.    ANTITRUST INJURY AND EFFICIENT ENFORCER CONCERNS

165.    To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations. In order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

166.    That is the case here. Defendants' serial manipulation of the SSA bond market harmed competition. As a result of Defendants' collusion, indirect purchasers, including Plaintiff and members of the proposed Class, paid higher prices for SSA bonds than they would have in a competitive market. *See* Exhibit "B", Declaration of Dr. Stephen E. Christophe, attached hereto and fully incorporated by reference.

167.    The injuries suffered by Plaintiff and members of the proposed Class are directly traceable to Defendants' anticompetitive conduct alleged herein. On any day that the SSA bond market was manipulated by Defendants, all members of the direct purchaser class in the MDL paid supracompetitive prices for those SSA bonds. Each time a member of the proposed Class purchased an SSA bond indirectly from a direct purchaser, the overcharge incurred by the direct purchaser as a result of Defendants' SSA bond market manipulation was directly passed on to the member of the proposed Class. Similarly, for any transaction in which a Defendant sold an SSA bond to a member of the MDL direct purchaser class at an artificially inflated (*i.e.*, price–

fixed) price and the purchaser resold that bond to a member of the Class proposed here, the MDL direct purchaser class member directly passed that anticompetitive overcharge to the member of the proposed Class in this case.

168.    To wit, as expressed in his declaration attached and incorporated herein, Dr. Christophe has determined that, if Plaintiff's allegations herein are true such that Defendants' have illegally conspired to manipulate bid and offer quotes as a means to implement a wider bid and offer spread, such manipulation would and did actually impact Plaintiff. *See* Exhibit "B" at 5 ("Even small reductions in the bid and offer spread would reduce the dollars paid for purchases and increase the dollars received for sales of the affected SSA bond investments held by the Funds owned by the Plaintiff's 401(k) Plans.").  As an illustrative example, Dr. Christophe examines the 2015 purchase and selling activity of a single index fund in which Plaintiff Stachon's 401(k) account was invested and concludes that if the purchase price and selling price had each been a mere ten basis points (10bp) lower and higher, the fund would have paid $566,000 less and received $218,000 more for the affected SSA bonds bought and sold by the Fund in that year. *See id.* at 5.  As he puts it, "[i]f Plaintiff's allegations are true, the investment returns of the affected SSA bonds held by the Funds owned by the Plaintiff's 401(k) accounts would have been negatively affected and, consequently, the value of Plaintiff's 401(k) accounts would also have been indirectly negatively impacted, on a pass-through basis." *Id.* at 6.

169.    Even a plaintiff that has suffered an antitrust injury, however, must also demonstrate that she is a suitable plaintiff, *i.e.*, an "efficient enforcer" of the antitrust laws. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005).

170.    Plaintiff in the instant context is an efficient enforcer.  The chain of causation running from Defendants' bad acts through New York, where Plaintiff's 401(k) plan's

investments were made, to Plaintiff's alleged injuries here is not attenuated. Plaintiff here is, while an indirect purchaser, a direct victim: through his New York based retirement plan, he literally traded all of his retirement investments, including SSA bonds, with and through Defendant UBS. (*See id.* (establishing the percentages of Plaintiff's retirement funds comprised of the SSA bonds).) Plaintiff's damages here, moreover, are not speculative. (*See* Christophe Declaration at 5-6 (concluding that "[e]ven small reductions in the bid and offer spread would substantially reduce the dollars paid for purchases and increase the dollars received for sales of the affected SSA bond investments held by the Funds owned by the Plaintiff's [retirement accounts]" and thus, "if Plaintiff's allegations are true . . . the value of Plaintiff's 401(k) accounts would also have been indirectly negatively impacted").) Finally, allowing Plaintiff to proceed with his indirect purchaser claims will not lead to duplicative recovery here.

## XI.    EQUITABLE TOLLING BECAUSE OF DEFENDANTS' CONCEALMENT

171.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their conspiracy from Plaintiff and members of the Class. Plaintiff and members of the Class did not know of, and could not have known of, Defendants' conspiracy at least until the Bloomberg article revealing the existence of the DOJ investigation was published on December 9, 2015. None of the facts or information available to Plaintiff before that time, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

172.    By its very nature, the unlawful conspiracy in which Defendants engaged was self-concealing. Defendants conspired to artificially manipulate the SSA bond market to the benefit of Defendants and to the detriment of Plaintiff and members of the Class. SSA bond trades occur primarily in private, OTC transactions, and Defendants' trades and trading

strategies are not public information. Reasonable due diligence could not have uncovered Defendants' conspiracy because the non-exchange-based, closed, and private nature of the trades helped to conceal Defendants' conduct.

173.    For such a conspiracy to work, it must remain secret—a fact which the cartel members understood. Not content to rely on the opaque nature of the market alone, Defendants also fraudulently concealed their anticompetitive activities.  As such, the substance—or even the existence—of the conversations occurring within these chat rooms was unknowable to Plaintiff until December 9, 2015, at the earliest.

174.    Further, as part of the "super-desk" strategy, Defendants often had to move inventory between and amongst cartel members.  Defendants would also seek to avoid scrutiny by falsely reporting the prices at which these sweetheart deals between conspiracy members occurred.

175.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class were tolled during the period of concealment.

## XII.    CLASS ACTION ALLEGATIONS

176.    Plaintiff brings this action on behalf of himself and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

> All persons or entities who, from January 1, 2005 to December 31, 2015 ("the Class Period"), indirectly entered into a U.S.-dollar denominated SSA bond transaction ("an Affected SSA Bond") with Defendants, or their respective subsidiaries or affiliates, by transacting with a member of the Direct Purchaser Class,[61] where the Direct Purchaser transacted directly with Defendants in

---

[61] The consolidated direct purchaser plaintiffs have defined their class as follows:  "All persons or entities who, from January 1, 2009 to December 31, 2015, directly entered into U.S. dollar-denominated SSA bond transactions with Defendants, or their respective subsidiaries or affiliates, in the United States or its territories or otherwise involving U.S. trade or commerce. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities."

New York or otherwise involving New York trade or commerce. Excluded from the Class are direct purchasers of same, Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities.

177.    ***Numerosity***. Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class, but believes that there are at least several hundred and likely thousands of Class Members geographically dispersed throughout the United States.

178.    ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class indirectly invested in the SSA bonds at issue in the Complaint and were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiff and members of the Class to pay inflated bond prices when the funds in which they were invested were buying SSA bonds, and to receive suppressed bond prices when the funds in which they were invested were selling SSA bonds.

179.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving his own claims, Plaintiff will prove other Class Members' claims as well.

180.    ***Adequacy of Representation***. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

---

*See Second Am. Compl.*, *In Re SSA Bonds Antitrust Litig.*, Case No. 1:16-cv-03711, Dkt. No. 506 at 202-203 (Nov. 13, 2018).

181.   *Commonality*. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

  a.   whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize USD SSA bond prices in interstate commerce in the United States;

  b.   the identity of the participants of the conspiracy;

  c.   the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

  d.   whether the alleged conspiracy violated the Donnelly Act;

  e.   whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiff and other members of the Class;

  f.   whether Defendants fraudulently concealed the conspiracy from Plaintiff and the Class;

  g.   the appropriate measure of damages sustained by Plaintiff and other members of the Class;

  h.   whether Plaintiff and other Class Members are entitled to injunctive relief; and

  i.   the appropriate injunction needed to restore competition.

182.   *Predominance*. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common

methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

183.    *Superiority*. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

184.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSE OF ACTION

**Violations of the Donnelly Act,**
**New York General Business Laws § 340, *et seq.***
**(Against All Defendants)**

185.    Plaintiff incorporates the preceding paragraphs and each allegation above as if fully set forth herein.

186.    Defendants, and their co-conspirators have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws § 340, *et seq.* (the "Donnelly Act").  Plaintiff, on behalf of the proposed Class of indirect purchasers, alleges as follows:

a.     Beginning at least as early as December 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in an agreement, arrangement, or combination, in violation of New York General Business Laws § 340, *et seq*., by engaging in the acts and practices detailed above.  Each Defendant has acted in violation of § 340 to restrain competition and fix, raise, and maintain artificial prices for USD SSA Bonds.

b.     Defendants' and their co-conspirators' agreement, arrangement, or combination had the following effects: (i) USD SSA Bonds price competition was restrained, suppressed, and eliminated throughout New York; (ii) USD SSA Bonds prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (iii) the Plaintiff and members of the Class were deprived of free and open competition; and (iv) the Plaintiff and members of the Class were overcharged for USD SSA Bonds Instruments that they indirectly purchased from Defendants and Defendants' co-conspirators.

c.     Throughout the Class Period, Defendants' anticompetitive conduct alleged herein substantially affected intrastate New York commerce.  Plaintiff's retirement plan and its affected investments were based in New York during the Class Period and/or purchased USD SSA Bonds in New York indirectly from one or more Defendants during the Class Period.  Many Defendants are headquartered in New York City and/or maintain their principal places of business in New York, and Defendants all conduct significant business in New York, including business relating to USD SSA Bonds.  Defendants Bank of America, N.A., Bank of America Merrill Lynch International Limited, Merrill Lynch International, Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Bank PLC, Barclays Capital Inc., Barclays Service Limited, Barclays Securities Limited; BNP Paribas, S.A., BNP Paribas Securities Corp.; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc., Citigroup Global Markets Limited; Credit Suisse Securities (USA) LLC; Deutsche

Bank Securities Inc.; Credit Agricole Corporate and Investment Bank; Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Securities (Europe) Ltd., Credit Suisse International; Deutsche Bank, Deutsche Bank Securities Inc.; HSBC Bank plc, HSBC Securities (USA) Inc.; Nomura Securities International, Inc., Nomura International plc, JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley; Morgan Stanley & Co., LLC; and RBC Capital Markets LLC all have their principal places of business and/or headquarters in New York, New York. Defendants Bank of America Corporation; UBS Securities LLC; Barclays Bank PLC; Credit Suisse AG; Deutsche Bank AG, and TD Bank all have major New York offices and conduct a substantial portion of their SSA bonds trading in New York. All Defendants communicated regularly with Defendant traders in New York for purposes of carrying out the unlawful conspiracy alleged herein.

    d. Defendants' agreement, arrangement, or combination impacted New York commerce and caused the Plaintiff and the members of the Class to incur anticompetitive overcharges on USD SSA bonds. Plaintiff and the members of the Class thereby suffered injury in fact in the form of lost money or property.

    e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the Donnelly Act, New York General Business Laws § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Class seek treble damages, costs of suit (up to $10,000), and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

   187. WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court:

a.     Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, designate Plaintiff as Class representatives, and appoint Plaintiff's counsel as counsel for the Class;

b.     Adjudge and decree that Defendants' unlawful conduct alleged herein violates the Donnelly Act;

c.     Adjudge and decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff and the Class;

d.     Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint;

e.     Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

f.     Award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

g.     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

h.     Award Plaintiff and the Class all available pre-judgment and post judgment interest, to the fullest extent available under law or equity, from the date of service of the initial Complaint in this action; and

i.     Order such other, further, and general relief as it may deem just and proper.

Dated: February 7, 2019                    Respectfully submitted,

                          By:     */s/ John J. Nestico*
                                  Garrett W. Wotkyns*
                                  John J. Nestico
                                  SCHNEIDER WALLACE COTTRELL
                                  KONECKY WOTKYNS LLP
                                  8501 N. Scottsdale Rd., Suite 270
                                  Scottsdale, Arizona  85253
                                  Telephone: (480) 315-3841
                                  Facsimile: (866) 505-8036
                                  gwotkyns@schneiderwallace.com
                                  jnestico@schneiderwallace.com

                                  Todd M. Schneider *
                                  Kyle G. Bates *
                                  James A. Bloom *
                                  SCHNEIDER WALLACE COTTRELL
                                  KONECKY WOTKYNS LLP
                                  2000 Powell Street, Suite 1400
                                  Emeryville, California 94608
                                  Telephone: (415) 421-7100
                                  Facsimile: (415) 421-7105
                                  tschneider@schneiderwallace.com
                                  jkim@schneiderwallace.com
                                  kbates@schneiderwallace.com
                                  jbloom@schneiderwallace.com

                                  Jeffrey Angelovich*
                                  Austin Tighe *
                                  Chad Ihrig *
                                  NIX PATTERSON LLP
                                  3600 N Capital of Texas Highway,
                                  Suite B350
                                  Austin, Texas 78746
                                  Telephone: (512) 328-5333
                                  jangelovich@nixlaw.com
                                  atighe@nixlaw.com
                                  cihrig@nixlaw.com

                                  Joseph C. Peiffer
                                  PEIFFER WOLF CARR & KANE
                                  201 St. Charles Avenue, Suite 4314
                                  New Orleans, Louisiana 70170

Telephone: (504) 586-5259
Facsimile: (504) 523-2464
jpeiffer@pwcklegal.com

Tracey B. Cowan
PEIFFER WOLF CARR & KANE
4 Embarcadero Center, Suite 1400
San Francisco, California 94111
Telephone: (415) 426-5641
Facsimile: (415) 402-0058
tcowan@pwcklegal.com

*Attorneys for Plaintiff*

*\* Pro Hac Vice Applications Forthcoming*